SOUTHWEST INDUSTRIAL PROD-
UCTS, Inc., a Corporation,
Plaintiff,

v.

EZEE STONE CUTTER MANUFACTUR-
ING COMPANY, a Corporation, and Bo
Gann and James Willis, Individually,
Defendants.

Civ. A. No. 1315.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Dec. 19, 1957.

Hardin, Barton, Hardin & Garner, Ft. Smith, Ark., Delmer L. Stagner, LeRoy Powers, Oklahoma City, Okl., Fishburn & Gold, Kansas City, Mo., for plaintiff.

Shaw, Jones & Shaw, Ft. Smith, Ark., A. Yates Dowell, Jr., Washington, D. C., for defendants.

JOHN E. MILLER, District Judge.

### Findings of Fact

1.

The plaintiff, Southwest Industrial Products, Inc., is an Oklahoma corporation, having its principal place of business at Oklahoma City, Oklahoma.

The defendant, Ezee Stone Cutter Manufacturing Company, is an Arkansas corporation with its principal place of business in Fort Smith, Arkansas. The defendants, Bo Gann and James Willis, are citizens and residents of Fort Smith, Arkansas.

The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

2.

In 1949 or 1950, G. B. Entz (assignor of the plaintiff herein) conceived the idea of making a stone cutting machine for the purpose of cutting building stone. He obtained the use of the facilities of the McFarlan Machine Shop at Hinton, Oklahoma, and constructed his first stone cutting machine. This rather simple machine included a frame with opposing jaws, each jaw having a continuous blade, and the jaws were operated by two hydraulic hand jacks in such a manner as

to cut or break the stone. Entz cut approximately 50 tons of stone with this machine, but its operation was not entirely satisfactory. Later, Entz conceived the idea of constructing a stone cutting machine which would have an equalized blade (made up of individual chisels) that would follow the contour of the stone, rather than a straight continuous blade such as the one used in his first machine. He had seen wheat drills in operation and thought the same principle could be applied to a stone cutting machine.

Entz went to Oklahoma City and contacted the Crowl Machine & Heat Treating Plant. He conferred with Leland Crowl, owner of the machine shop, and a Mr. Markwell, who worked in the shop. Entz explained his idea for the stone cutting machine, and Crowl agreed that such a machine might be feasible. They began work on the construction of the machine, and completed the first machine in about two months. The machine was completed in September of 1950 and was tested at that time. The test proved the machine to be successful, and production was begun on the stone cutting machines. The first full-size or 4-foot machine was completed in January of 1951, and during the year 1951 approximately eight machines were manufactured and sold to the public. The machines were manufactured for Entz by the Crowl Machine & Heat Treating Plant. During 1951 various minor improvements were made on the stone cutting machines.

### 3.

It developed that the stone cutting machines were difficult to move and handle, and Entz decided that he needed trailers on which to mount the machines in a manner that would permit the moving of the machines and also permit the machines to be set on the ground or some solid foundation when in use. He thought it would be possible to build a trailer with an offset axle similar to certain horse-drawn plows.

Entz contacted T. E. Mosley, a mechanic and welder who resided in Oklahoma City. Entz explained his need to Mosley, and Mosley proceeded to build a trailer for an Entz stone cutting machine. The first trailer was made in July or August of 1951, and required about 20 hours to build. Thereafter, practically all of Entz' stone cutters were mounted on trailers before being sold to the public.

### 4.

During the year 1952 Entz continued to sell his stone cutters at the rate of approximately two per month. The stone cutters were being manufactured by Crowl and the trailers were being made by Mosley. During 1952 minor improvements were made on the stone cutting machines, but apparently little, if any, change was made in the trailers.

### 5.

In the spring of 1953 Entz built his own shop so he would have a place to overhaul the stone cutting machines and to work on different improvements for the machines. Entz continued to sell them at the rate of approximately two per month during 1953.

### 6.

It developed that the trailers Entz was using were not entirely satisfactory in performance, and in the early part of 1953 a change was made in the location and hookup of the link mechanism in order to solve the difficulty. Apparently this change was the only one of significance made in the trailers after the first one was built in 1951.

### 7.

In the fall of 1953 Entz made several changes or improvements in the stone cutting machine. These improvements included: (1) pivoting of the wedges to their shanks (prior to this the wedges had been bolted in, and trouble was experienced with bolts breaking and in turn causing the stone to be broken or cut incorrectly); (2) providing a gable on one side of the head of the knives or chisels to provide a continuous cutting edge (prior to this there was a gap between each set of two chisels, and these gaps tended to cause some breakage of

the stone and to prevent a perfectly straight break); (3) a hydraulically operated gauge was added to determine the widths of the cut of the stone, and said gauge was designed to operate automatically (before this the gauge did not work automatically but was controlled by the operator of the machine); (4) some change was made in the washing system relating to the shanks of the lower chisels (the evidence was not clear as to the exact nature of this change, and apparently it was a minor one).

The first stone cutting machine containing these four improvements was first publicly displayed in January of 1954 at a convention in Washington, D. C.

8.

On November 2, 1953, Entz applied for a patent on the trailer he was using. The only difference in the trailer at that time and the ones Entz had been manufacturing since 1951 was in the location of the link mechanism. Thus, in all respects except this change of location, the trailer had been in public use and on sale more than a year prior to November 2, 1953.

On May 21, 1954, all claims of the trailer patent were denied by the examiner. Entz requested reconsideration, and on January 20, 1956, the claims were again denied by the examiner. Entz requested reconsideration, and finally on July 24, 1956, the examiner approved the application for a patent, and on September 11, 1956, patent No. 2,762,631 was issued to Entz.

The trailer as patented is of particular construction in which a relatively wide chassis frame is provided with few operating parts and practically none above the longitudinally extending side members so that the load may be disposed thereon and in close proximity to the ground wheels carried by the side members for lifting and lowering the chassis with respect to the ground wheels. The frame includes side members with two shafts extending thereacross and the ends extending outside the frame members, to which radial arms are attached and extend longitudinally of the side members

when the vehicle is in transporting position, and to a position diagonally upwardly. The wheels are thus mounted on the arms, two on each side of the frame structure. Rigidly secured to the outwardly extending portion of the shafts are levers which extend upwardly from the radial arms. There are two of the levers, one on the inside and one on the outside of one side member. These levers extend above the side member and are connected by spaced parallel links which are connected to the free ends of the levers.

One end of a hydraulic cylinder is connected to a bracket on the side member and the other end to a bracket or cross plate on the parallel links whereby, by the use of hydraulic fluid, the chassis or frame of the vehicle may be lowered so that the frame rests on the ground during stone cutting operation. Such construction provides space for containing the cutting machine. The structure is such that all four wheels are moved simultaneously with a single clyinder positioned over one side frame member for maximum use of the width of the frame in supporting the cutting machine without any extra links, cylinders and the like on the other side.

9.

On November 9, 1954, Entz applied for a patent on his stone cutter. With the exception of the four changes or improvements above mentioned in Finding of Fact No. 7, the stone cutter upon which the application was based was in all substantial respects the same as the stone cutters Entz had been selling on and before November 9, 1953. Therefore, with the above noted exceptions, the stone cutter had been in public use and on sale more than a year prior to November 9, 1954.

On January 31, 1955, the examiner denied all the claims of Entz contained in his application for a patent on the stone cutter. He requested reconsideration, and on January 19, 1956, the examiner again denied all the claims. Entz again requested reconsideration, and on

July 26, 1956, the examiner approved Entz' patent on the stone cutting machine, and said patent No. 2,762,359 was issued to Entz on September 11, 1956.

The stone cutter, patent No. 2,762,359, consists of a framework structure with posts on opposite sides and with upper and lower elongated cross-members connecting the upper and lower portions of the posts. It has upper and lower jaws, the lower jaws being mounted upon a cross-member, with cutting teeth or chisels mounted on the upper and lower jaws, the lower chisels facing upwardly and the upper chisels facing downwardly so that a stone may be contacted by the respective edges of the cutting chisels in longitudinal alignment. The lower jaw is moved towards the upper jaw in operation of the machine.

The machine includes means for adjusting the chisels in longitudinal alignment so that they will contact the stone on opposite sides in a substantially straight line. The chisels are independently operable one with relation to the other so that the cutting edges will contact the irregular surface of the stone and set thereagainst, the chisels having a shank with a transverse cutting edge on one end and a gable-like projection extending from a side of the shank provided with a cutting edge in continuation with said first cutting edge.

The patent includes a particular valve arrangement with controls for the hydraulic fluid whereby after a stone has been cut, movement of one control lever retracts the wedges, frees the chisels and automatically sets the gauge for the next stone, and simultaneous movement of another lever lowers the bottom jaw until the next stone may be moved forward over the chisels. Another control lever is then manipulated to raise the table and moves the chisels into contact with the stone. Then manipulation of the first mentioned lever moves the wedge rack to firmly set the chisels against the stone, and simultaneously moves the gauge out of the way. The third mentioned lever is then operated to perform the final cutting action.

10.

From 1950 until November 1956, Entz was continuously engaged in the business of developing, manufacturing, and marketing stone cutting machines. He used the name "Entz" on all his stone cutters, and a great majority of the stone cutting machines now in use in the United States are Entz machines. Entz spent approximately $5,000 to $6,000 per year in advertising and promoting his stone cutter. The stone cutter has been a commercial success, and the name "Entz" has acquired a secondary meaning in the stone industry.

In the summer of 1955, the defendant, James Willis, began working for Entz in his plant at Oklahoma City. Willis had no previous knowledge or experience in connection with the stone cutting industry.

During his employment by Entz, Willis became familiar with the Entz stone cutters and took measurements of various parts of said machines. Willis obtained and compiled a list of prospective buyers of stone cutters while he was working for Entz. Also, while working for Entz, Willis discussed with one of Entz' employees the possibility of leaving Entz and going into a competing business.

Willis left Entz' employment in March 1956. He then brought a man named John Mummey and the defendant, Bo Gann, with him to Oklahoma City, and they discussed with Entz the possibility of purchasing the business from Entz. Entz wanted $200,000 for the business and no sale was consummated.

The defendants, Willis and Gann, then formed a partnership and manufactured one stone cutting machine. They employed Bill Mason, a former employee of Entz, to build the machine. This machine was sold at a profit of approximately $1,500.

On September 17, 1956, Willis and Gann formed the Ezee Stone Cutter Manufacturing Company, a corporation, and thereafter built another stone cutting machine. The two stone cutting

machines made by defendants are in all substantial respects the same as the Entz stone cutting machine.

The defendants considered the use of the name "Intz" on their stone cutters because the "Entz" stone cutter was well advertised. However, they finally used the name "Ezee" for their stone cutters.

The first stone cutting machine manufactured by the defendants, Willis and Gann, was sold prior to September 11, 1956. That machine had an emblem very closely resembling the Entz emblem used on Entz stone cutters and advertising material.

The stone cutting machine constructed by the Ezee Stone Cutter Manufacturing Company has not been sold by defendants. This machine does not have an emblem similar to the Entz emblem. However, the defendant corporation used an emblem similar to the Entz emblem on one of its trucks.

The emblem used by defendants on the first stone cutting machine made by them and upon the truck is so similar to the Entz emblem that the public might well be confused.

Many of the parts used by defendants in the manufacture of their two machines were purchased from Crowl, and were parts that Crowl had manufactured for Entz.

## 11.

On December 8, 1956, Entz assigned to the plaintiff, Southwest Industrial Products, Inc., all of his interest in the patents in question, Nos. 2,762,359 and 2,762,631, together with all rights of Entz to any claims for damages and profits by reason of any past infringement of such patents.

Entz also assigned to plaintiff all his right, title, and interest in his emblems, good will, customer information, lists of potential customers, and trade information.

### Discussion

The plaintiff contends that the Entz patents covering the stone cutting machine and the trailer are valid; that they have been infringed by the defendants'

second stone cutting machine and trailer; and that the defendants have been guilty of unfair competition.

Defendants counter with the contention that the Entz patents are invalid and that the defendants have not been guilty of unfair competition.

Plaintiff makes no contention that the defendants have infringed or are infringing claims 1, 2, and 3, and claims 8 and 9 of the stone cutter patent. Plaintiff does contend that defendants have infringed and are infringing claims 4 to 7, inclusive, and claims 10 to 14, inclusive, of the stone cutter patent, No. 2,762,359, and all 5 claims of the trailer patent, No. 2,762,631. Defendants admit infringement of all these claims in the event the Court should find the patents to be valid.

Before specifically considering whether the two patents in question are valid, the Court believes it would be appropriate to state some of the general rules governing patent cases.

■ A patent is presumed to be valid, and the burden of establishing invalidity of a patent rests upon the person asserting such invalidity. Title 35 U.S. C.A. § 282. The person attacking a patent must make good his attack with reasonable clearness, and every reasonable doubt will be resolved against him. Long v. Arkansas Foundry Co., 8 Cir., 247 F.2d 366.

■ The presumption of validity of a patent is a rebuttable one, and the question of whether an improvement involves merely mechanical skill or inventive genius is ordinarily a question of fact. Steffan v. Weber Heating & Sheet Metal Co., 8 Cir., 237 F.2d 601. The presumption of validity of a patent is entitled to greater weight when the principal art relied upon by the defendant in an infringement action has been considered and rejected by the Patent Office. Holstensson v. Webcor, Inc., D.C.Ill., 150 F.Supp. 441, 446. And the commercial success of a claimed invention may be considered, and in a doubtful case may turn the scale in favor of the plaintiff.

Long v. Arkansas Foundry Co., supra; Paitier Corp. v. Daniels-McCray Lumber Co., D.C.Mo., 154 F.Supp. 635. A person is not entitled to a patent if his invention was "in public use or on sale in this country, more than one year prior to the date of the application for patent". Title 35 U.S.C.A. § 102.

 With regard to the trailer patent, No. 2,762,631, the Court is convinced that said patent is invalid. As stated in Finding of Fact No. 8, the trailer had been in public use and on sale more than a year prior to November 2, 1953, the date of the filing of the application for the patent. It is true that a change was made in the location of the link mechanism within the one-year period, but this change, although serving a useful purpose, falls far short of constituting an invention. In Ronning Machinery Co. v. Caterpillar Tractor Co., 7 Cir., 129 F.2d 70, 72, the court said:

"With all these and other readily accessible teachings shown in the record before him, Winsor did nothing more than attach a well known road grader to the front of an ordinary tractor, employing in the attachment a three-point suspension, a well known expedient, and placing the operator's station at a point where he could, with well known means, both steer the machine and operate the grader at one and the same time. Moving the tractor to the rear, even had it not been taught by the prior art, was a mechanic's choice. *Mere reversal of parts or change in proportions, such as increase in strength, size or weight is not usually deemed sufficient to constitute achievement of invention.*" (Emphasis added.)

To the same effect see, Todd v. Sears, Roebuck & Co., 4 Cir., 216 F.2d 594, 597; Electric Vacuum Cleaner Co. v. P. A. Geier Co., 6 Cir., 118 F.2d 221, 224; Sage v. Parkersburg Rig & Reel Co., 10 Cir., 80 F.2d 954, 957; Hughes v. Salem Co-Op Co., D.C.Mich., 134 F.Supp. 572, 578; Alma Motor Co. v. United States, 134 F.Supp. 659, 661, 133 Ct.Cl. 91.

The change in the location of the link mechanism involved nothing more than mechanical skill, and since the trailer, with the exception of this change, had been in public use and on sale more than one year prior to the time Entz applied for the patent, the trailer patent, No. 2,762,631, is invalid in its entirety.

The question of the validity or invalidity of the stone cutter patent presents a more difficult problem. At the outset the Court is met with defendants' contention that Entz was not, in fact, the inventor of the stone cutting machine. Although the evidence was somewhat conflicting on this point, the Court is of the opinion that Entz was the inventor of the stone cutting machine if in fact it should be determined that an invention is involved.

The defendants also contend strongly that the stone cutting machine in all its substantive aspects was in public use and on sale more than a year prior to November 9, 1954, the date Entz applied for a patent. Here again the evidence was conflicting, but in Finding of Fact No. 7 the Court found that four improvements were added to the stone cutting machine in the fall of 1953 and were not publicly displayed until January of 1954, which was within one year of the date of the application. With the exception of these four improvements the stone cutting machine had been in public use and on sale more than one year prior to the date of the application.

It is the contention of the plaintiff that the improvements made within one year before the application were sufficient to constitute the new machine a substantially different one from the machine that had been previously sold by Entz. The Court, however, is inclined to agree with defendants' contention that these improvements were "insufficient to breathe life into the erstwhile lifeless body of the invention, at least rendered lifeless by the inexcusable lapse of time after the invention was manufactured, sold, and publicly used".

In Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545,

549, 58 S.Ct. 662, 664, 82 L.Ed. 1008, the court said:

> "And the improvement of one part of an old combination gives no right to claim that improvement in combination with other old parts which perform no new function in the combination."

See also, Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

In the instant case the improvements made within the one-year period were not sufficient to reactivate any invention that may have been contained in the stone cutting machines which had been on sale for several years.

The next question is whether the claims embodying the four improvements set out in Finding of Fact No. 7 are valid in view of the invalidity of the remaining claims.

■ Each claim of a patent is a separate grant or invention. Priebe & Sons Co. v. Hunt, 8 Cir., 188 F.2d 880, 885; Hunt v. Armour & Co., 7 Cir., 185 F.2d 722, 729; Hall v. Keller, 5 Cir., 180 F.2d 753, 756; Smiths America Corp. v. Bendix Aviation Corp., D.C.D.C., 140 F.Supp. 46, 54; Marvel Slide Fastener Corp. v. Klozo Fastener Corp., D.C.N.Y., 80 F. Supp. 366.

In Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 319, 29 S.Ct. 495, 501, 53 L.Ed. 805, the court said:

> "Claims are independent inventions. One may be infringed, others not, and the redress of the patentee is limited to the injury he suffers, not by the abstract rights which have been granted him in other claims. One claim may be valid, all the rest invalid,—invalid for the want of some essential patentable

attribute. But what is good remains and is unaffected by its illegal associates. In such cases the patent does not stand or fall as a unity."

See also, Wire Tie Machinery Co. v. Pacific Box Corp., 9 Cir., 102 F.2d 543, 551; National Biscuit Co. v. Old South Cone Co., D.C.Mass., 25 F.Supp. 619, 622, affirmed National Biscuit Co. v. Crown Baking Co., 1 Cir., 105 F.2d 422.

Title 35 U.S.C.A. § 253 provides, inter alia:

> "Whenever, without any deceptive intention, a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid."

In the instant case there was no deceptive intention on the part of Entz, and the invalidity of some of the claims because of prior use and sale does not destroy the possible validity of the claims relating to improvements made within the one-year period.

■ As heretofore noted, claims 1, 2, 3 and claims 8 and 9 are not in issue. Claims 6, 13, and 14 relate to devices which were in public use and on sale more than a year prior to the application. This leaves for determination the validity of claims 4 and 5 relating to the automatic gauge; claim 7 relating to the lubricating or washing system; claims 10 and 11 relating to the gabled chisels; and claim 12 relating to the pivoted wedge.

■ Claims 4 and 5 relating to the automatic gauge are invalid for lack of invention. The automatic gauge served exactly the same purpose as the hand gauges used previously had served, and nothing more than mechanical skill was required to add the automatic gauge.

With regard to claim 7[1] concerning the lubricating or washing system of the

---

1. In a stone cutting machine, the combination of an upper jaw and a lower jaw between which the stone to be cut is moved and disposed, said jaws including means provided with cutting edges in confronting relationship, and in substantially the same vertical plane, for engagement with the top and bottom faces of the stone, the said means of said lower jaw including a plurality of independently movable chisels, in side-by-side relationship and including shanks and heads on the shanks providing the said cutting edges of said lower jaw, and means for delivering a lubricating-wash liquid to the shanks of said chisels for carrying away foreign matter from the chisels by gravity flow of the liquid.

shanks of the chisels, this system had been substantially perfected and in public use more than a year prior to the date of the application for a patent. In fact, Entz' 1953 brochure contained statements lauding the merits of the lubricating or washing device.[2] . Any changes made within the one-year period were minor in nature and involved nothing more than mechanical skill. Thus claim 7 relating to the lubricating or washing device is invalid for lack of invention.

Claims 10[3] and 11[4] relate to the chisels with gable-like projections designed to provide a continuous cutting edge on the machines. Prior to this improvement there had been gaps between each set of two chisels, and the gaps tended to cause breakage of the stone and to prevent perfectly straight breaks or cuts of the stone. The gabled chisels solved this problem. This is an improvement which was not anticipated by the prior art, and the Court is convinced that claims 10 and 11 are valid. Although at first blush the gabled chisels seem rather a simple .improvement, the improvement takes on additional signifi-

cance when it is observed that prior inventors working in this field had failed to conceive or use such a principle. In E. L. Bruce Co. v. Bradley Lumber Co., D.C.W.D.Ark., 79 F.Supp. 176, 182, this Court noted that "Simplicity of a process is not an objection and does not militate against the patentability of the process". And in Pointer v. Six Wheel Corp., 9 Cir., 177 F.2d 153, 161, the Court pointed out the fact that even a slight improvement may be an invention where it was not indicated by the prior art. It should also be remembered that "hindsight" is not a proper basis for determining patentability. Holstensson v. Webcor, supra, at page 447 of 150 F.Supp.

Therefore, the Court is of the opinion that claims 10 and 11 are valid.

Claim 12[5] relates to the improvement of pivoting the wedges to their shanks. This improvement falls in the same category as the gabled chisels. The pivoted wedges were not disclosed by the prior art, and the Court is convinced that the improvement amounted to an invention and that claim 12 is valid.

2. The 1953 brochure contained the following statements: "Every precaution has been taken to provide a fast, clean cutting operation. As an example, the 38 knives of the lower cutting jaw are kept free of cuttings and other debris by a simple washing system. A system so engineered that it cannot touch or discolor the stone."

3. In a cutting jaw for a stone cutting machine, the combination of a plurality of chisels, each comprising a shank having a transverse cutting edge at one end and a gable-like projection extending from a side of the shank provided with a cuttting edge in continuation with said first mentioned cutting edge, and means movably supporting said chisels in side-by-side relationship; with the cutting edges of the shanks and of the projections normally in the same line, but for movement axially independently one with respect to another whereby they may be independently moved to dispose their said cutting edges into intimate contact with the uneven surface of a stone, said means including spacers between said sides of adjacent chisels from which said projections extend.

4. The cutting jaw as specified in claim 10 in which said chisels are arranged in pairs, the chisels of each pair disposed with the sides of their shanks, opposite to those from which said projections extend, in sliding contact one with another.

5. In a stone cutting machine of the type in which independently movable chisels, of a jaw of the machine, are set with their cutting edges in intimate contact with an uneven face of a stone to be cut, by the driven action of a wedge provided for each chisel; the improvement which comprises, a shank associated with each wedge, a pivotal connection between one end of each shank and the driving end of its respective wedge, first means associated with the other ends of said shanks movable in one direction for simultaneously retracting the wedges from positions setting said chisels and second means associated with each of said wedges and said first means for independently biasing said wedges to chisel setting positions when said first means is moved in a direction opposite to said first mentioned direction.

The principal question remaining in the case is whether defendants have been guilty of unfair competition. The general rule on unfair competition is stated in Heuer v. Parkhill, D.C.W.D. Ark., 114 F.Supp. 665, 670, as follows:

" 'Unfair competition begins where imitation results in the deception of the customers of the party complaining.' International Heating Co. v. Oliver Oil Gas Burner & Machine Co., 8 Cir., 288 F. 708, 711, 30 A.L.R. 611.

" 'At 26 R.C.L. 875 it is stated: "Unfair competition ordinarily consists in the simulation by one person for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares of one person for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competition." ' Esskay Art Galleries v. Gibbs, 205 Ark. 1157, 1162, 172 S.W.2d 924, 926.

"See also, Judson Dunaway Corporation v. Hygienic Products Co., 1 Cir., 178 F.2d 461, 466; King Pharr Canning Operations, Inc., v. Pharr Canning Co., Inc., D.C.Ark., 85 F. Supp. 150, 153."

In the instant case plaintiff contends that the defendants were guilty of unfair competition in appropriating the list of possible customers; copying the form of Entz' emblem; and adopting a name so similar to the Entz name that the public might become confused. The defendants, of course, contend that they were not guilty of unfair competition.

With specific regard to the customers list compiled by Willis, the Court is of the opinion that plaintiff is not entitled to enjoin defendants from using said customers list.[6] This is not a case where the employee obtained the list surreptitiously as in the case of Brenner v. Stavinsky, 184 Okl. 509, 88 P.2d 613, relied on by plaintiff. Here Willis merely compiled a list in the ordinary course of his work. However, Willis did compile the list while working for Entz, and plaintiff is entitled to a copy of said list. Therefore defendants should be ordered to furnish plaintiff a copy of the list of prospective customers prepared by Willis while he was working for Entz.

The emblem used by defendants is so similar to the Entz emblem that the public would likely be confused, and plaintiff is entitled to an injunction enjoining defendants from using a label substantially similar to the Entz label.

The same thing is true with regard to the name "Ezee" adopted by defendants. Clearly this name was adopted by defendants in an effort to capitalize on the advertising done by Entz, and the use of said name is designed to and probably would confuse the buying public. It follows that plaintiff is entitled to an injunction enjoining defendants from using the name "Ezee" on their machines or in their advertising. The fact that the defendants' machines are similar in over-all appearance to the Entz machines is not in itself likely to confuse the buying public, and plaintiff is not entitled to an injunction in this regard. Compare, Oriental Foods, Inc., v. Chun King Sales, 9 Cir., 244 F.2d 909.

Plaintiff also contends that it is entitled to recover damages for the unfair competition, but the evidence is insufficient to support a finding of actual damages. Likewise, there was no showing of damages caused by defendants' infringement of claims 10, 11, and 12 of the stone cutter patent.

In accordance with the foregoing discussion, a judgment should be entered sustaining the validity of claims 10, 11, and 12 of the stone cutter patent, No. 2,762,359, and declaring claims 4, 5, 6, 7, 13, and 14 of said patent invalid; that defendants have infringed and are infringing claims 10, 11, and 12 of the stone cutter patent, and should be en-

---

6. On the general subject of customer lists, see Annotation, 126 A.L.R. 758.

joined from said infringement in the future and particularly enjoined from the sale of the stone cutting machine now in its possession as long as it infringes upon said claims 10, 11, and 12; that the trailer patent, No. 2,762,631, be declared invalid in its entirety and not infringed by defendants; that defendants have been guilty of unfair competition and that defendants be enjoined from using the name "Ezee" on their stone cutters or in their advertising matter, enjoined from using an emblem substantially similar to the Entz emblem, and directed to furnish plaintiff a copy of the list of prospective customers compiled by Willis during his employment with Entz; that the plaintiff is not entitled to recover any damages or attorney's fees of and from defendants, and that each party be directed to pay his or its own costs.

### Conclusions of Law

1.

The Court has jurisdiction of the parties and the subject matter herein.

2.

The trailer patent, No. 2,762,631, is invalid in its entirety, and has not been infringed by defendants.

3.

Claims 4, 5, 6, 7, 13, and 14 of the stone cutter patent, No. 2,762,359, are invalid and have not been infringed by defendants.

Claims 10, 11, and 12 of the stone cutter patent, No. 2,762,359, are valid, and have been infringed by defendants, and plaintiff is entitled to an injunction enjoining such infringement by defendants.

The evidence is insufficient to show any damages sustained by plaintiff as a result of the infringement of said claims.

4.

The defendants have been guilty of unfair competition and should be enjoined from using an emblem substantially similar to the Entz emblem and

from using the name "Ezee" on their machines or in their advertising matter. Defendants should also be directed to furnish plaintiff a copy of the list of prospective customers compiled by Willis during his employment with Entz.

5.

Plaintiff is not entitled to recover any damages or attorney's fees of and from defendants, and each party should be required to pay his or its own costs.

A judgment in accordance with the above should be entered.