**SHOPPERS FAIR OF ARKANSAS, INC.,
et al., Plaintiffs,**

**v.**

**The SANDERS COMPANY, Inc.,
Defendant.**

**No. 1616.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

Aug. 17, 1962.

JOHN E. MILLER, Chief Judge.

## STATEMENT

The above named plaintiffs filed their original complaint on October 25, 1961, in which they alleged that the acts of defendant, d/b/a "IGA Shoppers Fair," in Fort Smith, Arkansas, since its commencement in June 1961, constitute unfair competition with plaintiffs and an infringement of the rights of plaintiffs; that as a result of the sale operations and advertising of the plaintiffs and affiliates in states bordering Arkansas, the trade name and style, "Shoppers Fair," and distinctive means of plaintiffs' merchandising have developed and now have a secondary and distinctive trade name meaning to the public, and have come to and now do mean and stand for the stores, products and business operations of plaintiffs to the general public and to the general merchandising business throughout the United States; that the acts of the defendant impose a likelihood of injury to the business reputation of the plaintiffs, and that the distinctive quality of the trade marks, trade names, labels and forms of advertising of the plaintiffs would be diluted; that the plaintiffs intend to expand their line of business into the State of Arkansas and that the acts of the defendant are calculated to avail defendant of plaintiffs' valuable good will and are calculated to deceive and confuse the general public as to the source of goods purchased by them, so that the public is likely to believe that the goods of the defendant are goods of the plaintiffs, or that the plaintiffs are in some way connected with or in some way sponsors of defendant.

The defendant filed its answer on November 17, 1961, in which it denied the allegations of the complaint and specifically alleged that it commenced business as a retail grocery in Fort Smith under the name "IGA Shoppers Fair," at a time prior to incorporation of plaintiffs' Shoppers Fair of Arkansas, Inc., under the laws of the State of Delaware, or its qualification to do business in Arkansas; that the defendant operates a retail grocery store in which approximately 95

Cole, Friedman & Deitz, New York City, Warner, Warner & Ragon, Fort Smith, Ark., for plaintiffs.

Bryan & Fitzhugh, Fort Smith, Ark., for defendant.

percent of its sales in dollar volume are of groceries; that the defendant has not been in competition with any of the plaintiffs or their affiliates at any time or any place in that only 6 percent of defendant's sales are of wearing apparel, hardware, household appliances, sporting goods, cosmetics, etc., which are the line of goods sold by the plaintiffs or their affiliates; that the plaintiffs and affiliates have carried on none of their merchandising operations in the Fort Smith trade territory in particular, whereas the defendant's retail grocery operation has been carried on exclusively in Fort Smith.

Defendant further alleges that the words "IGA Shoppers Fair" have acquired a secondary meaning in the Fort Smith trade territory by means of advertising over radio and TV broadcasting stations and the newspapers, and in this manner has acquired valuable good will throughout the Fort Smith trade territory; that the words "Shoppers Fair" constitute a common name which the defendant had a right to appropriate in operation of its retail grocery store by using the trade name "IGA Shoppers Fair"; that the names "IGA Shoppers Fair" and "Shoppers Fair" are so dissimilar that no injury will result to the plaintiffs or affiliates by the defendant's use of its trade name, and that defendant commenced operations under the name "IGA Shoppers Fair" in good faith without prior knowledge of the use of the trade name "Shoppers Fair" by plaintiffs or affiliates.

On December 14, 1961, plaintiffs filed an amendment to their original complaint, in which they admitted that the plaintiff, Shoppers Fair of Arkansas, Inc., is a corporation organized under the laws of the State of Delaware, and maintains its principal offices in said state, that said plaintiff, Shoppers Fair of Arkansas, Inc., does no business in the State of Arkansas and does not maintain a place of business in the State of Arkansas at the present time.

On April 14, 1962, the plaintiffs filed a second amended complaint in which they reaffirmed and restated all allegations contained in the original complaint, and added as party plaintiffs the following:

Shoppers Fair of Baltimore, Inc.,
Shoppers Fair of Syracuse, Inc.,
Shoppers Fair of Rochester, Inc.,
Shoppers Fair of Evansville, Inc.,
Shoppers Fair of Indianapolis, Inc.,
Shoppers Fair of Detroit, Inc.,
Shoppers Fair of Akron, Inc.,
Shoppers Fair of Connecticut, Inc.,
Shoppers Fair of Flint, Inc.,
Shoppers Fair of Gary, Inc.,
Shoppers Fair of Columbus, Inc.,
Shoppers Fair of Dayton, Inc.,
Shoppers Fair of Saginaw, Inc.,
Shoppers Fair of South Bend, Inc.,
Shoppers Fair of West Vale, Inc.,
Shoppers Fair of Cleveland, Inc.,
Shoppers Fair of Wilmington, Inc.,
Shoppers Fair of East Detroit, Inc.,
Shoppers Fair of Livonia, Inc.,
Shoppers Fair of Pensacola, Inc.,
Shoppers Fair of Canton, Inc.,
Shoppers Fair of Down River, Inc.,
Shoppers Fair of Greece, Inc.,
Shoppers Fair of Speedway, Inc.,
Shoppers Fair of Battle Creek, Inc.,
Shoppers Fair of Jackson, Inc.,
Shoppers Fair of Lansing, Inc., and
Mangel Stores Corporation.

The plaintiffs further alleged that all of the plaintiffs including the additional ones are corporations organized and existing under the laws of the State of Delaware and constitute the affiliated corporations referred to in the original complaint, and that Mangel Stores, Inc., is the parent corporation and is the owner of all outstanding common stock of each of the co-plaintiffs.

On May 21, 1962, the defendant filed its answer to the amended complaint, in which it reaffirmed and restated all the allegations and statements set forth in its original answer as to each added plaintiff set forth in the amended complaint.

The case was tried to the court on May 22 and 23, 1962, and at the conclusion of the presentation of the testimony, it was

taken under advisement by the court subject to submission by the parties of briefs in support of their respective contentions. The briefs have been received, and the court, having considered the pleadings, the testimony adduced at the trial, the exhibits and briefs of counsel, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## FINDINGS OF FACT

### 1.

The plaintiff, Mangel Stores, Inc., is a corporation incorporated under the laws of the State of Delaware with its principal office and place of business in New York City, New York.

### 2.

The plaintiff, Shoppers Fair of Arkansas, Inc., is a corporation incorporated under the laws of the State of Delaware. On the 11th day of August, 1961, it filed its application with the Secretary of State of Arkansas for authority to do business in Arkansas. However, Shoppers Fair of Arkansas, Inc., does no business in the State of Arkansas and does not maintain a place of business in the State of Arkansas, but it has designated an agent for service of process, which agent is a resident of Little Rock, Arkansas.

### 3.

The remaining co-plaintiffs are corporations incorporated under the laws of the State of Delaware with their principal offices and places of business in states other than the State of Arkansas.

### 4.

The defendant is a corporation incorporated under the laws of the State of Arkansas with its principal office and place of business in the City of Fort Smith, Arkansas.

### 5.

The amount in controversy in this cause exceeds the sum of $10,000.00, exclusive of interest and costs.

### 6.

The plaintiff, Mangel Stores, Inc., hereinafter called Mangel, was incorporated in 1929 and has been in continuous operation since that date. Prior to 1956 Mangel was the parent corporation of a chain of downtown retail department stores with department stores downtown in the larger cities in several states. These department stores operated in a conventional manner to the extent that sales people were employed to wait on customers and sell items in each individual department.

Later in 1955 Mangel became aware of a falling-off of business in its downtown department stores, and its officers sought a new means of merchandising its usual department store items. At that time Mangel became interested in developing another method of merchandising retail items, which consists of a self-service discount type of operation similar to the operation of supermarkets located in suburban shopping centers. The virtue of this new operation was that it would allow the plaintiff to continue to sell high-quality national brands of merchandise at discount prices by eliminating the need of sales people along with increasing the volume of sales characteristic of supermarket types of operations.

Mangel adopted the name "Shoppers Fair," which was to be applied to each of these new supermarket-type department stores because it considered the name to be an apt description of this form of retail merchandising. Since it contemplated more than one of this type department store, it distinguished each Shoppers Fair corporation by adding its geographical location either by designation of the city or the state in which it was to carry on its operations. Although Mangel did not register this particular trade name, it investigated the possibility of prior appropriation, and did not find there had been any prior users of the trade name "Shoppers Fair."

The first of the new enterprises, designated "Shoppers Fair of Bridgeport, Inc.," commenced operations early in 1956, and since that date Mangel has

caused to be incorporated an increasing number of Shoppers Fair discount department stores in various states throughout eastern, southern, southwestern and midwestern United States. This adopted method of retail merchandising has proven so successful that Mangel has been disposing of its conventional downtown department stores at every opportunity, and in the last two or three years has put into operation nine or ten new Shoppers Fair discount department stores each year.

### 7.

Each of the co-plaintiffs, the various Shoppers Fair discount department stores with the exception of Shoppers Fair of Arkansas, Inc., which has not commenced to do business in Arkansas, is actively engaged as a discount department store, the essence of which operations is uniformity. This results from the fact that each of these co-plaintiffs, including Shoppers Fair of Arkansas, Inc., is a wholly owned subsidiary of Mangel, the parent corporation and owner of all outstanding common stock of each of the co-plaintiffs.

Since Shoppers Fair of Tulsa, Inc., is located the shortest distance from Fort Smith (138 miles), and since the only evidence and testimony introduced that pertained to the operations of a Shoppers Fair store in particular was based on the operations of the Shoppers Fair of Tulsa, this court assumes that these operations represent a typical method of the operation of the other Shoppers Fair stores, aside from any special facts existing in the Tulsa trade area itself.

The Shoppers Fair of Tulsa, Inc., hereinafter called Tulsa, commenced its operations on September 29, 1960, at its present location in the Nathan Hale Shopping Center in Tulsa. There are a number of other retail establishments located in this same shopping center, all of which are considered by the plaintiff to be noncompetitive. Such establishments include, but are not confined to, a grocery supermarket, florist, pharmacy, hardware store, appliance dealer and shoe repair.

Tulsa's line of goods sold by the various departments consists of what is known as "hard" and "soft" goods, i. e., ready-to-wear clothing, cosmetics, appliances, hardware and a number of other nonperishable items. Shopping carts are made available for the use of customers while serving themselves, and most of the employees, other than the manager and his office staff, are engaged either in stocking the counters or shelves, or in checking out the customers after they have completed their shopping.

The name "Shoppers Fair" figures prominently in the store's operations. Although it appears on very few items of merchandise offered for sale, it does appear on the smock-like uniforms worn by the employees, on all of the price tags, on banners and signs posted throughout the interior of the store, and on paper bags and other wrappings of the packages. In these instances the name "Shoppers Fair" appears in light-colored letters on a dark oval background. The above device is in two forms. The first has no other lettering other than "Shoppers Fair." The other form has the words "Shoppers Fair" in large letters and above them appears the following in smaller letters: "Complete discount department store," and under the words "Shoppers Fair" appears the following in smaller letters: "Everything for the family and home." The same device appears in the newspaper ads, on the store's stationery, and on boxes and tape used in mailing. The store building proper is designated as "Shoppers Fair," which words consist of large free-standing letters. Also, in the parking lot in front of the building the words "Shoppers Fair" appear on a pylon-type of sign.

Since it commenced operations in 1960 the plaintiff has carried on an extensive campaign of advertising by use of the following media: both of the Tulsa newspapers, the Tulsa radio stations, both Tulsa TV stations, billboards on roads leading to and from downtown Tulsa, and by the use of direct mailing to Tulsa residents of sale notices. Tulsa has ordered no advertising through the

Fort Smith newspapers, radio stations, or the one Fort Smith TV station.

The trade area of the City of Tulsa, named the "Magic Empire," is stated by Tulsa businessmen to extend out to approximately a 150-mile radius, which would include eastern Oklahoma and western Arkansas. However, this trade area does not apply to Tulsa's line of business, which attracts the great majority of its customers from the metropolitan and suburban areas of the city proper. There have been only isolated instances, in which a customer has been asked to identify himself in connection with check cashing, by which Tulsa has ascertained that a customer is from eastern Oklahoma or western Arkansas.

### 8.

The defendant was incorporated in 1961 and began doing business under the trade name of "IGA Shoppers Fair" on June 8, 1961, in Fort Smith, Arkansas, as a grocery supermarket. The initials "IGA" stand for Independent Grocers Alliance, of which the defendant is a member. Under the terms of its written agreement with IGA, defendant has agreed to buy its merchandise from a central warehouse set up by the IGA and to use its initials in designating the name of its retail store. IGA on its part permits the defendant to purchase its grocery items at a reduced price made possible by volume buying, and it services defendant's accounts and assists in setting up the store and maintaining its operation. Approximately 95 percent of the goods sold by the defendant consists of fresh fruits, milk products, canned vegetables, frozen vegetables, cereals, dried fruits, fresh vegetables, frozen fruits, canned fruits, meats, spices, dried vegetables, bread, pastries, milk, eggs and flour. Most of these items sold are national brands and IGA brands, and are competitively priced. The remaining 5 percent of the items sold consist of cosmetics and various small items for the home.

Prior to and at the time the defendant was ready to open its new grocery super-market for business, it had not selected a suitable name. The President of the defendant, Mr. Bob Sanders, wanted to use the name "Shopper" or "Shoppers" in the new name but could not think of a suitable combination of words. The new store building, which had been painted in bright colors and had been gaily decorated for the opening, attracted much attention from various passers-by, one of whom suggested to Mr. Sanders that the store was decorated "just like a fair." Upon hearing this comment, Mr. Sanders combined the words "Shoppers" and "Fair" and decided on the name "Shoppers Fair," by which name, preceded by the initials "IGA", the store has been identified since its opening. At the time he named the store Mr. Sanders had never heard of the name "Shoppers Fair" either in Tulsa or anywhere else. Approximately two weeks after the defendant's opening as "IGA Shoppers Fair," Mr. Sanders was informed of Tulsa's existence, and it was not until he received a certified letter from the plaintiffs' attorneys, dated August 15, 1961, that he became aware of plaintiffs' extensive use of the trade name "Shoppers Fair" in trade areas other than that of Tulsa. In compliance with his agreement with IGA, those initials precede the name "Shoppers Fair" at all times and in every transaction and connection in which the store's name is used. The IGA products that the store sells bear no other name than the initials "IGA", such products being sold in all IGA stores irrespective of the store's local designation.

The IGA Shoppers Fair is the only business activity of the defendant, and that activity is confined to that of a grocery supermarket, which depends upon self-service by the customers and large volume sales for its income and is typical of any other grocery supermarket-type of operation.

The defendant has confined its daily advertising coverage to Fort Smith newspapers, radio stations, and Fort Smith's only TV station. The area of coverage of these advertising media roughly corresponds to what is known as the Fort

Smith trade area, which area covers between 10 and 14 counties in western Arkansas and eastern Oklahoma within a 50–60 mile radius, and is considered to be an isolated trade area among advertising and mercantile circles. In his testimony, Mr. Paul Latture, President of the Fort Smith Chamber of Commerce, characterized the Fort Smith trade area as an "isolated market." When asked the meaning of this term and its origin, Mr. Latture stated that such a term means that a given trade area is independent, i. e., it has all the services from its own advertising media; that it enjoys its own social, agricultural, and economic activities; and that all of the above services and activities can be found within this territory. With respect to Fort Smith, Mr. Latture stated that within the city limits, "we have all the services that are necessary for human beings to live." The vast majority of defendant's customers reside in the Fort Smith area proper.

## 9.

There have been very few incidents of confusion between the discount department store operation known as "Shoppers Fair of Tulsa, Inc.," and the grocery supermarket operation known as "IGA Shoppers Fair." In November 1961 an invoice for chocolates from the Rockwood Chocolate Company of Brooklyn, New York, to IGA Shoppers Fair was billed to Mangel as the parent corporation of the several Shoppers Fair discount department stores, which misunderstanding was cleared up when Mangel refused to pay same and returned the bill to the candy company, which then proceeded to correctly bill IGA Shoppers Fair for the shipment of candy. Salesmen for various suppliers from time to time have asked the personnel of Shoppers Fair of Tulsa, Inc., whether they have a branch in Fort Smith. In these cases their misapprehension was corrected by personnel of plaintiff, and there has been no record of any sales made or lost because of such mistake. Some customers have asked the same question of sales persons, but there, too, their mistakes have been

pointed out and there is no record of any purchases having been made based on such mistakes. Within the last few months the Shoppers Fair discount department stores have begun to stock such items with the trademark "Shoppers Fair" as regular coffee, instant coffee, liquid detergent, all-purpose cleaner, floor wax, regular cleaner and floor cleanser. Milk and tea bags of the same trademark are programmed to be sold in the near future.

## 10.

The only indication of actual competition between the defendant and Tulsa appears to occur in those food and non-food items which both parties sell in their retail stores. Such items will include coffee, various cleansers, and cosmetics and toiletries, as well as minor household items. However, the overlap appears to occur mainly in those non-food items which the defendant stocks in order to supply any needs of the "impulse" grocery buyer, and in the case of Tulsa any food items that it stocked appear to cater to the same impulses of its customers. In other words, the overlap occurs in more or less subsidiary items carried by each party, Tulsa being primarily engaged in the selling of hard and soft nonperishable goods, and the defendant being engaged in the selling of various food items.

There is no indication that either party has lost business because of the other party's merchandising operations, nor does it appear that either party has traded upon or benefited from the other party's trade name.

## 11.

In keeping with its program of expansion, Mangel has incorporated "Shoppers Fair of Arkansas, Inc.," with an end in view of locating a store either in Little Rock or Fort Smith, and Mangel, through its officers, has conducted a thorough investigation of each location. At each location there are many factors to be taken into consideration, the most important of which consist of the situation of the store proper, leasing arrange-

ments that are available and potentialities of the trade area in general. At this time there is no indication as to whether Mangel has chosen either or both Little Rock or Fort Smith as a proposed location for a Shoppers Fair discount department store; and furthermore there is no indication as to the date that such choice will be made, or if made, when it will be acted upon.

## DISCUSSION

The court's jurisdiction is based on diversity of citizenship and amount involved. The claim of plaintiffs is based upon the alleged infringement of a common-law trade name and not a federally registered trade name, and the court must follow the conflict of laws rule prevailing in the state in which it sits. Therefore, the whole substantive law of Arkansas is the applicable law. Klaxon Co. v. Stentor Electric Mfg. Co., (1941) 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; and Addressograph-Multigraph Corp. v. American Expansion Bolt & Mfg. Co., (7 Cir. 1941) 124 F.2d 706.

Since the plaintiffs conduct their operations in the State of Oklahoma and other states and the defendant conducts its operations in the State of Arkansas, the court is required to determine which law, under the Arkansas rules of conflict of laws, would govern the present case. In 148 A.L.R., page 142, this problem is taken up, and the editors of the annotation conclude that the rule that issues of substantive law in an action for unfair competition are governed by the law of the place of wrong requires a definition of what constitutes the place of wrong. In the situation before the court the question then arises whether the place of wrong is (1) the place where the plaintiffs conduct their business, or (2) the place where the defendant conducts its business and from which it sells its goods, or (3) the place where the defendant's goods are actually delivered to the purchaser who is allegedly deceived as to their origin. There have been no Arkansas cases or cases from any other jurisdiction which directly answer this question. However, in Leflar, The Law of the Conflict of Laws, (1959) Sec. 111, p. 210, it is stated:

"* * * The orthodox rule, with torts as with crimes, is that when an act operates across a state line its legal character is determined by the law of the place where it first takes harmful effect or produces the result complained of."

Taking these rules into consideration and the fact that the defendant conducts its business in Arkansas and its goods are actually delivered to the purchasers who are allegedly deceived in Arkansas, therefore the first harmful effect has occurred in Arkansas. Then it is apparent that under the Arkansas conflict of laws rules, the Arkansas substantive law governing unfair competition would apply to the instant case.

It has often been held that Arkansas law is in accord with the general law governing unfair competition, and a recent statement to this effect was made in the case of Liberty Mutual Ins. Co. v. Liberty Ins. Co. of Texas, (E.D.Ark. 1960) 185 F.Supp. 895, at page 903:

"To the extent that the rights of the parties to this action may be governed by Arkansas law, it may be said that the Arkansas law of trademarks, trade names, and unfair competition appears to be orthodox and in accord with the general principles heretofore stated. See Liberty Cash Groceries, Inc. v. Adkins, 190 Ark. 911, 82 S.W.2d 28; Fine v. Lockwood, 179 Ark. 222, 14 S.W.2d 1109; Beneficial Loan Corporation v. Personal Loan & Finance Corporation, supra [D.C.], 100 F.Supp. [838], at page 845."

A preliminary contention of the plaintiffs is that the defendant, being a corporation, has no legal right to carry on its business under an assumed name, to-wit: "IGA Shoppers Fair." Actually this contention is not material at this stage of the proceedings since it was not pleaded in the complaint nor was any evidence introduced to support it. Ark.

Stat.Ann., Sec. 70–401 (1957 Repl.), which prohibits any person from conducting business under an assumed name unless duly registered, does not apply to any domestic or foreign corporation lawfully doing business in the state. Ark. Stat.Ann., Sec. 70–404 (1957 Repl.).

The main issue in the case is whether the defendant is guilty of unfair competition by means of trade name infringement. In answering this question the court must resolve the subsidiary issues of (1) whether the trade names involved in the present action have acquired a secondary meaning in the Fort Smith trade area; and (2) whether confusion exists at present or is likely to arise in the future in the mind of the ordinary purchaser which would result in one party gaining an unfair advantage over the other.

Although neither side has registered the trade name "Shoppers Fair," all contend that the name has acquired a secondary meaning in the Fort Smith trade area which entitles each of them to protection from infringement by the other, which amounts to unfair competition. This court and many other courts have had occasion to put the concept of unfair competition by means of trade infringement, as well as the subsidiary concept of secondary meaning which a trade name must acquire in order to be protected in the first place, in their proper relationship, as well as to give consideration to the public policy on which such actions as the present one are based. In King Pharr Canning Operations v. Pharr Canning Company, 85 F.Supp. 150, at page 153 (W.D.Ark.1949), this court stated:

"The law of trade-marks is ordinarily inseparably connected with the law of unfair competition, with the former being but a part of the broader field of the latter. Thus, even though a mark has not been registered or is incapable of becoming a valid trade-mark, because it may not be exclusively appropriated by any one person, still, in a proper case, one may be protected under the law of unfair competition from the acts of another in passing off the latter's goods or business for the goods or business of the former. The protection, of course, runs to the business man or merchant injured and to the public, the protection of the public from such deceitful practices being of primary consideration. Too, there is the underlying principle of promoting honesty and fair dealing. See: Nims, Unfair Competition and Trade-Marks, Volume 1, Chapter 11, page 36, for a discussion of the basis of the action for unfair competition."

Several decisions on this subject deal in matters involving trade-marks of goods rather than in trade names as are involved in the present case. The case of American Steel Foundries v. Robertson, 269 U.S. 372, at page 380, 46 S.Ct. 160, at page 162, 70 L.Ed. 317 (1926), clears up any confusion as to the difference between a trade-mark and a trade name, in which the court stated:

"Whether the name of a corporation is to be regarded as a trade-mark, a trade name, or both, is not entirely clear under the decisions. To some extent the two terms overlap, but there is a difference more or less definitely recognized, which is, that, generally speaking, the former is applicable to the vendible commodity to which it is affixed, the latter to a business and its good will. See Ball v. Broadway Bazaar, 194 N.Y. 429, 434–435, [87 N.E. 674]. A corporate name seems to fall more appropriately into the latter class. But the precise difference is not often material, since the law affords protection against its appropriation in either view upon the same fundamental principles."

The two essential elements of an unfair competition action based on trade-name infringement were stated in the case of McGraw-Hill Publishing Co. v. American Aviation Associates, 73 App. D.C. 131, 117 F.2d 293, at page 296 (D.C.

Cir.1940), in which the court made this statement:

> "* * * Unfair competition in the trade name field is not concerned with intent or plan; it is enough if the acts of the defendant in light of the plaintiff's reputation result in an unfair benefit to the former. To constitute unfair competition in respect to a trade name, two elements must be present. The name must have acquired a secondary meaning or significance that identifies the plaintiff; the defendant must have unfairly used the name or a simulation of it against the plaintiff."

The concept of secondary meaning has been defined recently in the case of Liberty Mutual Ins. Co. v. Liberty Ins. Co. of Texas, 185 F.Supp. 895, at page 903 (E.D.Ark.1960), in which the court stated:

> "There are certain names, marks, and symbols which in their primary sense are merely generic or descriptive and do not ordinarily indicate the origin of goods or services. Such names, marks, or symbols, when used in their primary sense, cannot form the subject matter of a trade or service mark. However, a name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods and services may become so associated in the public mind with such goods or services that it serves to identify them and distinguish them from the goods or services of others. When such an association exists, the name, mark, or symbol is said to have acquired a 'secondary meaning' in which the original user has a property right which equity will protect against unfair appropriation by a competitor. Armstrong Paint & Varnish Works v. Nu-Enamel Corporation [305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195], supra; Katz Drug Co. v. Katz, 8 Cir., 188 F.2d 696; Beneficial Industrial Loan Corporation v. Kline, 8 Cir., 132 F.2d 520; Beneficial Loan Corporation v. Personal Loan & Finance Corporation, D.C.Ark., 100 F.Supp. 838; 87 C.J.S., [Trade-Marks, Trade-Names and Unfair Competition] supra, § 90. A trade-mark or a trade name may have acquired a secondary meaning in one locality but lack such a meaning in another. Schwartz v. Television Center, 89 U.S.App.D.C. 30, 189 F.2d 691; Beneficial Industrial Loan Corporation v. Allenstein, 5 Cir., 173 F.2d 38; Griesedieck Western Brewery Co. v. Peoples Brewing Co., 8 Cir., 149 F.2d 1019. Whether in a given case a name, mark, or symbol has acquired a secondary meaning is a mixed question of law and fact 'with the factual aspects predominating.' Beneficial Loan Corporation v. Personal Loan & Finance Corporation, supra, 100 F.Supp. at page 846."

Under the above definition plaintiffs contend that the name "Shoppers Fair" has become universally associated with its discount retail operations in the sale of hard and soft goods as carried on in Tulsa and in trade areas located in other states. By the same token the defendant contends that the name "Shoppers Fair" preceded by the initials "IGA" conveys only one meaning in the Fort Smith trade area, and that is the defendant's operation of the retail grocery supermarket.

This court, having carefully considered all of the facts and the applicable law, is of the opinion that insofar as the plaintiff, "Shoppers Fair of Tulsa, Inc.," and other plaintiffs are concerned, their trade name of "Shoppers Fair" has acquired a secondary meaning limited to the Tulsa trade area and other trade areas, which areas do not include Fort Smith. As for the defendant, the name of its supermarket, "IGA Shoppers Fair," has acquired a secondary meaning in the Fort Smith trade area only. As for the plaintiff, "Shoppers Fair of Arkansas, Inc.," since it has not commenced operation at all, its name has no secondary meaning in any trade area of the State of Arkansas. As stated by the

court in the case of Beneficial Loan Corp. v. Personal Loan & Finance Corp., (E.D. Ark.1951) 100 F.Supp. 838, at page 848:

"* * * The fact that a trade mark or trade name may have acquired a secondary meaning in one locality does not mean that it has acquired such meaning in an entirely different trade area where the public is unfamiliar with such name or mark. Liberty Cash Groceries, Inc. v. Adkins [190 Ark. 911, 82 S.W.2d 28], supra; Fine v. Lockwood [179 Ark. 222, 14 S.W.2d 1109], supra; Katz Drug Co. v. Katz, both decisions, supra; Griesedieck Western Brewery Co. v. Peoples Brewing Co., 8 Cir., 149 F.2d 1019, 1022; Beneficial Industrial Loan Corporation v. Allenstein, 5 Cir., 173 F.2d 38; Schwartz v. Television Center, [89 U.S.App.D.C. 30] D.C.Cir., 189 F.2d 691, 692. In the case last cited the Court quoted with approval from Nims, 'Unfair Competition,' 3d Ed., Section 37, where it is said: 'Secondary meaning is *association*, nothing more. It exists only in the minds of those of the public who have seen or known or have heard of a brand of goods by some name or sign and have associated the two in their minds.' "

The association in the public mind in each of the above trade areas has been confined to the secondary meaning of the dominant trade name in the respective trade area, and there has been no overlapping of one secondary meaning into another trade area to any noticeable extent.

█ In this connection plaintiffs contend that due to the large number of their sister stores, which surround the State of Arkansas, the secondary meaning of the name "Shoppers Fair" has all but pervaded the atmosphere of the whole State of Arkansas, and the Fort Smith trade area particularly, and since the property right of the prior appropriator or user in the name follows the business, defendant has no right to continue to use the same name in the conduct of

its retail operations in the Fort Smith trade area. This reasoning is without merit and carries little weight, for as the court said in the case of Katz Drug Co. v. Katz, (E.D.Mo.1950) 89 F.Supp. 528, at page 536:

"Plaintiff, in support of its argument, emphasizes the fact that it operates a system of chain stores. 'It makes no difference that the first user of a trade name operates his own business through multiple units located in different parts of the state. The right of a chain store operator is no different than that of others. (Citations.)' Direct Service Oil [Co.] v. Honzay, 1941, 211 Minn. 361, 2 N.W.2d 434, 437, 148 A.L.R. 1."

The Eighth Circuit Court of Appeals in its opinion affirming the same case stated in 188 F.2d 696, at page 699, as follows:

"It appeared to the trial court that although the cases of Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713, United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141, and Sweet Sixteen Co. v. Sweet '16' Shop, 8 Cir., 15 F.2d 920, do not present the particular state of facts found to exist in this case, they do furnish a guide to the law to be applied. They settle in this circuit that there is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade with which the mark is employed and that as stated by the trial court, 'An injunction [to protect exclusive enjoyment of trade name] must be limited in regard to territory.' See Cook Chemical Co. v. Cook Paint & Varnish Co., 8 Cir., 185 F.2d 365.

* * * * * *

"The appellant's contention that because its trade name has had secondary meaning in Kansas City, Missouri, it should be held to have the same meaning throughout the state of Missouri and therefore in the St. Louis area, appears to be

without merit. It is in conflict with the concept of property in a trade name being exclusively a right appurtenant to an established business or trade with which the mark is employed. The exception appears to be the cases that rest on state statutes conferring state-wide protection. See e. g. ABC Stores, Inc. v. T. ·S. Richey & Co., Tex.Com.App., 280 S. W. 177."

The plaintiffs further contend that their trade name is "coined" and "fanciful", and therefore under the rule in the case of Stork Restaurant v. Sahati, (9 Cir. 1948) 166 F.2d 348, it is entitled to a higher degree of protection. This court does not agree that under the present facts plaintiffs' name is so unique as to deserve extra protection. Since it has not attained the status of a technical name, plaintiffs must rely on the doctrine of secondary meaning in order to gain protection, and in this respect any peculiar characteristic of the name in question is but one of many factors to be taken into consideration. In the case of Landers, Frary & Clark v. Universal Cooler Corp., (2 Cir. 1936) 85 F.2d 46, at page 48, Judge Learned Hand aptly evaluated the possibility of degrees of secondary meaning as follows:

"* * * It is quite true that, just as a coined word is easier to protect than a word of common speech upon goods on which the owner has used it, so it is easier to prevent its use upon other kinds of goods. The proprietary connotation,—'secondary meaning,'—of a word of common speech is harder to create and easier to lose, and its fringe or penumbra does not usually extend so far as that of a coined word. But that is matter of proof and of that alone; if the owner can in fact show that the fringe does extend to other goods there is no reason why his interest should not be recognized. His interest is exactly the same as though the mark were a coined word (his reputation and his chance to extend his sales); and

while the plagiarist has a better excuse because the law recognizes that all have an interest in the free use of the language, the conflict is between the same interests as when the owner seeks to protect the name upon goods which he has sold. It would therefore be wrong to make any absolute distinction between coined, and colloquial, names. Nor do such cases as Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713, and United Drug Co. v. [Theodore] Rectanus Co., 248 U. S. 90, 39 S.Ct. 48, 63 L.Ed. 141, offer any difficulty."

Therefore to the extent that the doctrine of secondary meaning is applicable to the instant case, it is the opinion of the court that the trade name "Shoppers Fair" as used by any of the plaintiffs as discount department stores does not extend beyond the boundaries of any of their respective trade areas, and in no case has their use of the name "Shoppers Fair" extended to any part of the State of Arkansas. Specifically this applies to the plaintiff "Shoppers Fair of Tulsa, Inc.," with reference to the Fort Smith trade area in western Arkansas. As for the defendant, its use of the trade name "IGA Shoppers Fair" has acquired a secondary meaning in the Fort Smith trade area as a grocery supermarket, but it is limited to this particular trade area.

Since the element of secondary meaning applies to the use of "Shoppers Fair" as a trade name by the plaintiffs and the defendant in their respective spheres of operation, the court must determine whether the defendant is guilty of unfair competition by the present use of the name "IGA Shoppers Fair" and whether its further use will result in unfair competition.

The doctrine of unfair competition with respect to infringement on a trade name was recently defined in the case of Liberty Mutual Ins. Co. v. Liberty Ins. Co. of Texas, 185 F.Supp. at page 903, supra, as follows:

"In a case of this kind 'unfair competition' may be defined, in gen-

eral, as a course of dealing which leads, or is likely to lead, the public into believing that the goods or services of one supplier are those of another. 87 C.J.S. Trade-Marks, Trade-Names, and Unfair Competition § 13, and cases there cited. While it has been held that a charge of unfair competition cannot be sustained absent proof of subjective fraudulent intent on the part of the defendant, the rule now seems to be that 'proof of a fraudulent intent is not required where the necessary and probable tendency of defendant's conduct is to deceive the public, and pass off his goods or business as and for that of plaintiff, especially where only preventive relief against continuance of the wrong is sought or granted.' 87 C.J.S., supra, § 93, pages 334–335. And in Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, supra, 305 U.S. at page 325, 59 S.Ct. at page 196, it was said that the facts supporting a suit for infringement of a trade-mark and one for unfair competition are substantially the same."

This court has had occasion to define unfair competition by appropriation of another's trade name in advertisements in the case of Heuer v. Parkhill, (W.D. Ark.1953) 114 F.Supp. 665, at page 670:

"The following quotations illustrate the law relating to the copying of advertising matter by competitors:

" 'The general rule is that the appropriation of another's advertising matter or method is not of itself unfair competition, although it may become such where it induces or may induce the public to suppose that in dealing with the appropriator they are dealing with or obtaining the product or services of the originator * * *'. 52 Am.Jur., Trademarks, Tradenames, and Trade Practices, Section 116, Page 595.

" 'Unfair competition begins where imitation results in the deception of the customers of the party complaining.' International Heating Co. v. Oliver Oil Gas Burner & Machine Co., 8 Cir., 288 F. 708, 711, 30 A.L.R. 611.

" 'At 26 R.C.L. 875 it is stated: "Unfair competition ordinarily consists in the simulation by one person for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares of one person for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor." ' Esskay Art Galleries v. Gibbs, 205 Ark. 1157, 1162, 172 S.W.2d 924, 926."

See, Southwest Industrial Products, Inc. v. Ezee Stone Cutter Mfg. Co., (W.D. Ark.1957) 157 F.Supp. 208, aff'd 8 Cir., 262 F.2d 183.

In actions similar to the instant one the general rule was that the prior appropriation of the trade name was protected so long as there was direct competition from any other would-be appropriator. This rule was stated by the Eighth Circuit in the case of Sweet Sixteen Co. v. Sweet "16" Shop, (8 Cir. 1926) 15 F.2d 920, at page 923:

"Confessedly, then, the general rule is that, while the first appropriator and user of a trade-mark owns such mark and is entitled to protection by the courts in the use thereof, against subsequent users on the same class of goods, such protection will not be afforded as against a subsequent user and appropriator, who in good faith adopts and uses the mark in territory into which the goods of the first appropriator have not penetrated and have not been used or sold. Hanover Milling Co. v. Metcalf, supra; United Drug Co. v. Theodore Rectanus Co., suppra."

However, the trend is away from this strict requirement of direct competition, and the Eighth Circuit Court of Appeals

has had occasion in two contemporaneous cases to express this modern trend. In the case of General Finance Loan Co. v. General Loan Co., 163 F.2d 709, at page 711, the court made the following statement:

> "It is true that under the early English and American cases absence of direct competition in the same identical field of business was a good defense to a charge of unfair competition. But in this country that rule has been progressively relaxed in many jurisdictions in suits to enjoin unfair competition. 52 Am.Jur., Trademarks, Tradenames, Etc., §§ 97, 142; Lady Esther, Ltd., v. Lady Esther Corset Shoppe, Inc., 317 Ill.App. 451, 46 N.E.2d 165, 148 A.L.R. 6; Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 247 F. 407, L.RA.1918C, 1039; British-American Tobacco Co., Ltd. v. British-American Cigar Stores Co., 2 Cir., 211 F. 933, Ann.Cas.1915B, 363."

The same court in the case of Hanson v. Triangle Publications, 163 F.2d 74, at page 78, then stated the present law on this subject:

> " * * * Under present general law, the use of another's mark or name, even in a noncompetitive field, where the object of the user is to trade on the other's reputation and good will, or where that necessarily will be the result, may constitute unfair competition. See e.g. Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972, 974; Del Monte Special Food Co. v. California Packing Corporation, 9 Cir., 34 F.2d 774; Atlas Diesel Engine Corp. v. Atlas Diesel School, D.C., E.D.Mo., 60 F.Supp. 429. This inherently would seem to imply— though the cases are not unanimous in their theory—such a reputation and good will in the circumstances as to make it likely that the public will be confused or deceived by the particular use."

Returning to the General Finance Loan Co., 163 F.2d at page 712, supra, the court considered what it described as "the ultimate question" of the effect of confusion on the general public:

> " * * * The ultimate question is not, therefore, whether the evidence shows actual confusion but whether confusion is likely to result in the use of similar corporate names of parties engaged in kindred businesses in the same territory, or whether the names of the defendants are so distinguished from that of the plaintiff as to prevent any probable confusion. Furniture Hospital v. Dorfman, 179 Mo.App. 302, 166 S.W. 861, 863. The question of confusion is one of fact, but it is not incumbent upon the plaintiff to allege and prove actual confusion or deception, but only such similarity of names with other facts and circumstances as to show that confusion may result. Supreme Lodge of World, Loyal Order of Moose v. Paramount Progressive Order of Moose, 224 Mo.App. 276, 26 S.W.2d 826; Mary Muffet, Inc., v. Smelansky, Mo.App., 158 S.W.2d 168."

Thus, under the present general rule the criteria of confusing the public mind has been carried to the extent of eliminating the necessity of direct competition not only in a geographical sense but also in the same class goods. This rule was stated in Brown & Bigelow v. B·B Pen Co., (8 Cir. 1951) 191 F.2d 939, at page 944:

> " * * * But when considering the question whether or not confusion will be caused in the minds of purchasers as to the origin of products, the existence or absence of competition does not rule out consideration of the fact that the parties are engaged in business with different classes of trade. In Cook Chemical Co. v. Cook Paint & Varnish Co., supra, the court recognized and gave consideration to the fact that the parties were not selling the same product, but the court found in that case that there was nevertheless confusion in the minds of the public

and a mistaken belief that Cook Chemical's products emanated from the Cook Paint & Varnish Company."

In spite of the judicial trend which acknowledges that actual competition is not the sole criteria of unfair competition, and that the latter may result from the dilution of business good will in ways not connected directly with the possible loss of a sale through deception or confusion as established in the case of Stork Restaurant v. Sahati, supra; yet in cases where there is an absence of market competition or confusion of source, the courts have placed considerable weight on the factor of complete absence of any competition at all. Fairway Foods v. Fairway Markets, (9 Cir. 1955) 227 F.2d 193. In the case of Sunbeam Furniture Corp. v. Sunbeam Corp., (9 Cir. 1951) 191 F.2d 141, the court stated as follows beginning at page 144:

"The California corporation also claims that the trial court erred in issuing its injunction against its use of the name 'Sunbeam Furniture Corp.' As to this aspect of the case, the evidence reveals neither market competition nor confusion of source. The business to which the word 'Sunbeam' is applied as a mark is entirely different from that of the Illinois corporation. It is true that actual competition, while an important factor to consider, is not a necessity to the granting of relief. Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 1929, 34 F.2d 774; Stork Restaurant v. Sahati, 9 Cir., 1948, 166 F.2d 348; Safeway Stores, Inc., v. Dunnell, 9 Cir., 1949, 172 F.2d 649, certiorari denied, 337 U.S. 907, 69 S.Ct. 1049, 93 L.Ed. 1719; Lane Bryant Inc., v. Maternity Lane, Limited, of California, 9 Cir., 1949, 173 F.2d 559. Nevertheless, where market competition is absent, it is a corollary that the likelihood of confusion in the mind of the buyer decreases."

In the instant case the evidence does not establish direct market competition between the parties either geographically or by similarity of goods sold. Each party is situated in a different and distinct trade area and is engaged in high volume sales of low-cost merchandise, of which there is not more than a 5 to 6 percent overlap in similarity of the goods sold.

Thus, in the absence of competition plaintiff must establish confusion of source which includes dilution of the senior appropriator's trade name by a knowing junior appropriator.

The doctrine of confusing similarity and its factors, upon which an action for unfair competition based on trade-name infringement lies, is stated in the recent case of Standard Oil Co. v. Standard Oil Co., (10 Cir. 1958) 252 F.2d 65, beginning at page 72:

"* * * There is confusing similarity 'if prospective purchasers are likely to regard it [the offending designation] as indicating the source identified by the trade-mark or trade-name.' Factors bearing on the question of confusing similarity as stated in Restatement of the Law, Torts, vol. 3, sec. 729, pp. 592–593, were listed with approval by this court in Avrick v. Rockmont Envelope Co., 10 Cir., 155 F.2d 568, 572. So far as pertinent these factors are:

"(1) Degree of similarity in appearance, sound and meaning;

"(2) Intent of the defendants in adopting and using the term * *; and

"(3) The degree of care likely to be exercised by purchasers.

*     *     *     *     *     *

"While in some cases, particularly those involving labels, the question of confusing similarity may be determined by visual observation of the words, signs, or symbols involved, the test is not solely such a 'juxtaposition comparison.' The setting in which the designations are used must be considered. As said in Av-

rick, supra, 155 F.2d at pages 572–573:

> " 'It is the total effect produced by the designation in the mind of the ordinary purchaser, exercising due care in the market place.' "

> \*    \*    \*    \*    \*    \*

> "Infringement is not to be determined on the basis of the words or symbols themselves to the exclusion of other considerations. It is not necessary for similarity to go only to the eye or the ear for there to be infringement. The use of a designation which causes confusion because it conveys the same idea, or stimulates the same mental reaction, or has the same meaning is enjoined on the same basis as where the similarity goes to the eye or the ear. Confusion of origin of goods may be caused alone by confusing similarity in the meaning of the designations employed. The whole background of the case must be considered."

As stated above, the first factor is degree of similarity of the trade names in question. As for the similarity of meaning, this court has stated already that the name "Shoppers Fair" in the Tulsa trade area has a secondary meaning distinct from the name "IGA Shoppers Fair" as used in the Fort Smith trade area both among retail customers and trades people. Of course, the names have a similar sound, but the initials "IGA" are sufficiently distinct to set apart the defendant's trade name from that of the plaintiff.

As to appearance, this court has found that the trade name of each party is depicted in a different manner, the most important of which is that the defendant's name is preceded by the initials "IGA". Plaintiffs contend the addition of these initials to a common trade name is not significant, but in the case of Daggett & Ramsdell, Inc. v. I. Posner, Inc. (C.C.P.A.1960) 277 F.2d 952, at page 954, the court stated the rule as follows:

> "On several other occasions various courts have disregarded the surname in a trademark because it was

determined that the rest of the mark was dominant. See California Prune & Apricot Growers Association v. Dobry Flour Mills, Inc., 101 F.2d 838, 26 CCPA 910; Ambassador East, Inc. v. Orsatti, Inc., 3 Cir., 1958, 257 F.2d 79; Miles Shoes, Inc. v. R. H. Macy & Co., Inc., 2 Cir., 1952, 199 F.2d 602. On the other hand, in a number of instances the surname has been found to be the dominant part of the mark, or at least significant (and perhaps no less dominant than the rest of it), and has, accordingly, been considered by the courts in determining the issue of the likelihood of confusion. Yard-Man, Inc. v. Savage Arms Corp., 220 F.2d 782, 42 CCPA 862; Best & Co. v. Miller, 2 Cir., 1948, 167 F.2d 374; New Yorker Hotel Corporation v. Pusateri, D.C.W.D. Mo.1949, 87 F.Supp. 294. Thus, it is apparent that a surname can be a significant or co-equal portion of a trademark and must not always be totally disregarded in deciding a question of confusing similarity."

This court is of the opinion that the presence of the initials "IGA," as a "surname" or "family" name denoting a "family" of grocery supermarkets, is significant in the present case not only because its distinctive appearance sets apart defendant's trade name of "Shoppers Fair" from the same trade name used by the plaintiffs, but the "IGA" itself has a secondary meaning in the trade areas of Tulsa and Fort Smith as well as in several other trade areas in Arkansas, Missouri and Oklahoma as an independent grocery supermarket chain. Thus, any use of the distinctive initials "IGA" by any merchant in the above trade areas, regardless of the name that follows, would designate him as a retail grocery supermarket proprietor, who is a member of the Independent Grocers Alliance.

The second factor bearing on the factor of confusing similarity is that of intent of the defendant in adopting and using the name "Shoppers Fair." A recent

statement of the liability of a knowing junior user is stated in the case of Pike v. Ruby Foo's Den, Inc., (1956) 98 U.S. App.D.C. 126, 232 F.2d 683, at page 686 as follows:

"The Federal cases are virtually unanimous against a knowing junior user. See, for example, Food Fair Stores, Inc., v. Food Fair, Inc., 1 Cir., 1949, 177 F.2d 177; Stork Restaurant, Inc., v. Sahati, 9 Cir., 1948, 166 F.2d 348; White Tower System, Inc., v. White Castle System, 6 Cir., 1937, 90 F.2d 67; Buckspan v. Hudson's Bay Co., 5 Cir., 1927, 22 F.2d 721, certiorari denied, 1928, 276 U. S. 628, 48 S.Ct. 321, 72 L.Ed. 739; Sweet Sixteen Co. v. Sweet '16' Shop, Inc., 8 Cir., 1926, 15 F.2d 920. Although all of these cases involve at least minor contacts by the senior user with the locale in which the junior user is doing business, so that knowing junior use is not the sole factor present, at least one commentator has concluded that 'the presence of notice is the determinative factor, usually sufficient in itself to bar the second user's claim.' Developments in the Law—Trade Marks and Unfair Competition, 68 Harv.L.Rev. 814, 858 (1955). The only Federal case we have found which seems to point in the opposite direction is Lerner Stores Corp. v. Lerner, 9 Cir., 1947, 162 F.2d 160, but in that case the trade name was the personal name of the junior user and he went to considerable pains to distinguish his enterprise from that of the senior user."

See, Faciane, d/b/a White Kitchen, v. Starner, (5 Cir. 1956), 230 F.2d 732.

The plaintiffs contend that not only did the defendant know of its prior use of the name "Shoppers Fair" when it opened its Fort Smith supermarket but the defendant continued to use the same name in order to fraudulently gain business for its grocery operations by trading on a nationally known name. The cases relied on by the plaintiffs are mostly cases in which the court found an express fraudulent intent or, at best, a weak excuse for the appropriation of a senior user's trade name. Lincoln Restaurant Corp. v. Wolfies Restaurant, Inc. (2 Cir. 1961) 291 F.2d 302; Ambassador East, Inc. v. Orsatti, Inc. (3 Cir. 1958) 257 F.2d 79; Stork Restaurant v. Sahati, supra; Sweet Sixteen Co. v. Sweet "16" Shop, supra. Courts are quick to grant relief in cases of fraud or bad faith, even though the businesses of the litigants are not in competition. 52 Am.Jur., Trademarks, Tradenames, etc., Sec. 101. One of the reasons is well expressed in A.L.I. Restatement of Torts, Vol. III, p. 595:

"But if he adopts his designation with the intent of deriving benefit from the reputation of the trademark or trade name, his intent may be sufficient to justify the inference that there is confusing similarity. Since he was and is intimately concerned with the probable reaction in the market, his judgment manifested prior to the controversy, is highly persuasive. His denial that his conduct was likely to achieve the result intended by him will ordinarily carry little weight."

Plaintiffs argue that the court must find fraud or deceit on the part of the defendant because at the time of the establishment of the defendant's business either it or the representatives of the Independent Grocers Alliance had knowledge of the plaintiffs' business and use of their trade name in Tulsa, if not in the other trade areas as well. A careful consideration of the record and exhibits leaves this court in no doubt that by the preponderance of the evidence there was no fraud nor deceit by the defendant in the continuation of its business nor in its original establishment. There is no evidence that indicates that the defendant knew that the name "Shoppers Fair" was used by the plaintiffs in Tulsa and appeared on some of the products sold, but even if the evidence indicated otherwise it would be fair for the defendant to have inferred from such notice that the plaintiff did not have an exclusive right to such use as against a

noncompeting business where there was no likelihood of confusion as to source and in the absence of an intent to benefit from the reputation of good will of the plaintiff. El Chico, Inc. v. El Chico Cafe, (5 Cir. 1954) 214 F.2d 721.

The third factor is based upon the degree of care likely to be exercised by the ordinary prudent purchaser. Plaintiffs contend that due to their retail operations in many states, as well as their extensive advertising program and partial similarity of goods sold, that customer confusion has resulted even though the customer is one possessing ordinary discrimination. The effect of extensive advertising on customer confusion is analyzed in the case of Fairway Foods, Inc. v. Fairway Markets, Inc., supra, 227 F.2d at page 196 as follows:

"It is not a convincing argument that because radio advertising and newspaper advertising are not physically contained within state lines, someone in the territory wherein plaintiff sells groceries might be induced thereby to buy some groceries from defendant or that such person might in so doing mistakenly think he was buying of plaintiff or buying plaintiff's goods."

Plaintiffs have not shown actual customer confusion outside of a few isolated instances, and the case of American Automobile Ins. Co. v. American Auto Club, (9 Cir. 1950) 184 F.2d 407, at page 410, states the applicable rule as follows:

"If no likelihood of deception appears the plaintiffs cannot prevail even though the absence of competition be treated as no objection. As 'probable confusion cannot be shown by pointing out that at some place, at some time, some one made a false identification', so the possibility that in rare and isolated instances relatively few persons may carelessly mistake the source does not warrant relief."

Therefore, the court is of the opinion that there has been no confusing similarity by the defendant's use of the trade name "IGA Shoppers Fair" in the Fort Smith trade area.

However, plaintiff contends that it is entitled to injunctive relief because there is the likelihood of future confusing similarity for two reasons: (1) plaintiff has expanded its line of goods to include some food and grocery items as heretofore listed, and (2) plaintiff intends to expand its discount department store operation into Arkansas at either Little Rock or Fort Smith.

In the case of S. C. Johnson & Son, Inc. v. Johnson, (2 Cir. 1940) 116 F.2d 427, at page 429, Judge Learned Hand lays down the ground rules for the expansion of a prior user of a trade name into sales of a different line of goods:

"Obviously the plaintiff cannot stand upon the usual grievance in such cases; i. e. that the defendant is diverting its customers. * * * Therefore it invokes the doctrine that when a good will is established under the owner's name, given or assumed, he may protect it, not only against the competition of those who invade his market, but also against those who use the name to sell goods near enough alike to confuse his customers. We have often so decided, and it is not necessary to do more than refer to our last discussion. Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., [D. C.] 105 F.2d 908. Since in such a situation the injured party has not lost any sales, the courts have based his right upon two other interests: first, his reputation with his customers; second, his possible wish to expand his business into the disputed market. The first of these is real enough, even when the newcomer has as yet done nothing to tarnish the reputation of the first user. Nobody willingly allows another to masquerade as himself; it is always troublesome, and generally impossible, to follow the business practices of such a competitor closely enough to be sure that they are not damaging, and the harm is frequently done

before it can be prevented. Yet even as to this interest we should not forget that, so long as the newcomer has not in fact misconducted himself, the injury is prospective and contingent, and very different from taking away the first user's customers. The second interest is frequently less palpable. It is true that a merchant who has sold one kind of goods, sometimes finds himself driven to add other 'lines' in order to hold or develop his existing market; in such cases he has a legitimate present interest in preserving his identity in the ancillary market, which he cannot do, if others make his name equivocal there. But if the new goods have no such relation to the old, and if the first user's interest in maintaining the significance of his name when applied to the new goods is nothing more than the desire to post the new market as a possible preserve which he may later choose to exploit, it is hard to see any basis for its protection. The public may be deceived, but he has no claim to be its vicarious champion; his remedy must be limited to his injury and by hypothesis he has none. There is always the danger that we may be merely granting a monopoly, based upon the notion that by advertising one can obtain some 'property' in a name. We are nearly sure to go astray in any phase of the whole subject, as soon as we lose sight of the underlying principle that the wrong involved is diverting trade from the first user by misleading customers who mean to deal with him. Unless therefore he can show that, in order to hold or develop his present business, he must preserve his identity in the disputed market, he cannot rely upon the second of the two interests at stake. We discussed this in Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., supra (105 F.2d 908) but the decision did not depend upon it. It follows from what we have said that the newcomer will be subject to stricter limitations upon the use of his name when he is competing in the first user's own market, than if, as here, he has been the first to enter a new, though closely related, market."

The rule governing protection of a trade name on the basis of natural expansion is stated as follows in the case of Katz Drug Co. v. Katz, 89 F.Supp. 528, beginning at page 534:

"A number of cases have been cited by plaintiff's counsel in support of the field of natural expansion theory. It is readily seen that these cases do not require the plaintiff to show competition or loss of trade in order to obtain injunctive relief; but it is also apparent that in these cases there was present a showing of one of the following facts: either (1) that the junior appropriator adopted the senior user's mark with a 'design inimical to the interests' of the latter, that is, adopted it in bad faith; or (2) that the senior user, at the time of the adoption of the mark by the junior user and in the territory in which the junior user employed the mark, had something variously denominated by different courts as 'secondary meaning', 'good-will', or 'reputation'.

\*     \*     \*     \*     \*     \*

" \*     \*     \*     In adopting a trade name or trade-mark, how far must the adopter look to see if a similar mark is in use? If a similar mark is in use, and it is wholly unknown in the area in which the so-called adopter wishes to use it, there is nothing to put him on notice. If the adopter in such a case wishes to open a retail drugstore in St. Louis, must he search Kansas City? Chicago? Des Moines? Denver? It seems unnecessary."

A recent statement applies the good faith of the junior user as a standard in the case of Food Fair Stores, Inc. v. Lakeland Grocery Corp., (4 Cir. 1962)

301 F.2d 156, beginning at page 162 as follows:

"The existence or non-existence of good faith on the part of the second user of the trade name is a powerful factor in determining whether the name is entitled to protection in an area to which the business it identifies has not actually extended. Indeed, it is pointed out in Nims on Unfair Competition and Trademarks, Section 218b, page 649, that to some extent the emphasis of the inquiry has been shifted in determining whether a trademark or trade name is entitled to extra-territorial protection, so that in some cases much more stress is placed upon the question of good faith and much less on the extent to which the name is known in a given area. See Pike v. Ruby Foo's Den, 98 U.S.App.D.C. 126, 232 F.2d 683; Lincoln Restaurant Corp. v. Wolfies Restaurant, Inc., supra; Safeway Stores, Inc. v. Sklar, E.D.Pa., 75 F.Supp. 98; Adam Hat Stores v. Scherper, E.D.Wis., 45 F.Supp. 804; Ammon & Person v. Narragansett Dairy Co., 1 Cir., 262 F. 880; Maison Prunier v. Prunier's Restaurant & Cafe, Inc., 159 Misc. 551, 288 N.Y.S. 529."

As stated above, this court has found no evidence of bad faith or fraudulent intent on the part of the defendant in the choice of and continued use of its trade name "IGA Shoppers Fair." Thus, under the rule set forth it is not liable to be enjoined from further use of its trade name.

In conclusion, the plaintiffs have sought injunctive relief on the basis that (1) there is confusing similarity by means of defendant's present scope of operation under the trade name of "IGA Shoppers Fair," and (2) if not at present, there is the likelihood of customer confusion due to the plaintiffs' plans for expansion both as to the variety of goods sold and the contemplated entry of the plaintiff, Shoppers Fair of Arkansas, Inc., into either the Little Rock or Fort Smith trade areas. This court is of the opinion that under the rule of law heretofore set out that there is no confusing similarity in the retail operations of the parties at present, and as to the possibility of future expansion, there are no present grounds to support an injunction against the defendant. However, this does not preclude the plaintiffs from injunctive relief at such time as their plans for expansion become a reality and they can show positive damages due to unfair competition arising out of defendant's operations in the Fort Smith trade area as "IGA Shoppers Fair." In the case of Food Fair Stores v. Food Fair, (1 Cir. 1949) 177 F.2d 177, in which there were cross appeals from a final decree enjoining the defendant from using the words "Food Fair" in its business unless such words were prefaced by a descriptive word or words, the court stated, beginning at page 185, as follows:

"Traditionally 'The essence of equity jurisdiction has been the power of the Chancellor [i. e. the trial court] to do equity and to mould each decree to the necessities of the particular case.' Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754. Hence as an appellate tribunal we are loath to interfere with the scope of the injunctive relief afforded. Nor do we feel inclined to do so for the reason that at the moment the parties are not in direct competition and such relatively minor confusion as now exists, it seems to us, can be obviated by the expedients required by the decree as it stands. Perhaps this may not always be so. Should the plaintiff expand its chain into Massachusetts and the parties come into direct competition, then it may be that the relief granted would not give the plaintiff adequate protection. But it will be time enough to consider this question when it arises, for the parties are not irrevocably bound by the decree as it stands. If circumstances change the court below is open to the plaintiff to seek

modification of the present decree under the principle enunciated in United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999, in which Mr. Justice Cardozo, speaking for the court, said that even when power to modify a decree of injunction has not been reserved therein, that power nevertheless exists 'by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need', and then, after citing cases, continued: 'The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative * * * a court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong.' See also S. C. Johnson & Son v. Johnson, 2 Cir., 175 F.2d 176, 177."

A similar statement appears in the case of Fairway Foods v. Fairway Markets, supra, 227 F.2d at page 198 as follows:

"There remains for disposition on this appeal, the injunction which enjoins plaintiff from using the word 'Fairway' in the territory now occupied by defendant, should plaintiff at some time in the future act upon its asserted intention of extending its business into such territory. Government by injunction is never favored, and the discretion of the chancellor in favor of granting the writ is withheld except to prevent impending injury or wrong, and is not granted upon indefiniteness and remote possibilities. No present impending injury can be found in this case. It may well be that if and when plaintiff acts to carry out its expressed intention to expand into the territory presently occupied by defendant, the facts will be sufficiently different from those of the instant case as to commerce and otherwise, and as to the validity of the claimed trade-mark, as to present additional and different issues."

See, Katz Drug Co. v. Katz, 188 F.2d at page 700; American Automobile Ins. Co. v. American Auto Club, supra, 184 F.2d at page 410; and Save-A-Stop, Inc. v. Sav-A-Stop, Inc., 230 Ark. 319, 322 S.W.2d 454 (1959).

## CONCLUSIONS OF LAW

### 1.

The court has jursidiction of the parties to and the subject matter of this cause of action.

### 2.

The defendant, Sanders Company, Inc., has a legal right to conduct its retail supermarket operations under the name of "IGA Shoppers Fair."

### 3.

In view of the law and facts heretofore stated, it is clear that the defendant in commencing operation of a retail grocery supermarket without prior notice under the trade name "IGA Shoppers Fair" in Fort Smith, Arkansas, at a date subsequent to plaintiffs' commencement of operations as a retail discount department store under the trade name "Shoppers Fair" in Tulsa, Oklahoma, was not guilty of unfair competition, and the plaintiffs are not entitled to an injunction against defendant's use of the above trade name.

### 4.

In view of the law and facts heretofore stated, it is clear that the plaintiffs in planning to expand their operations into Arkansas under the trade name "Shoppers Fair of Arkansas, Inc.," and to increase their variety of merchandise to include food and grocery items are not entitled to an injunction at the present time on the basis of unfair competition

by defendant's prior use of the trade name "IGA Shoppers Fair" in the State of Arkansas in general and in the Fort Smith trade area in particular.

Therefore, a judgment dismissing plaintiffs' complaint is being entered today.